ELON BERK, ESQ. (SBN 209642)
GUROVICH, BERK & ASSOC.
15250 Ventura Blvd., Suite 1220
Sherman Oaks, CA 91403
Tel: 818-205-1555
Email: eberk@crimlawla.com
Attorneys for Defendant,
Surgery Center Management, LLC.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>  *vs*.<br><br>JULIAN OMIDI and SURGERY CENTER MANAGEMENT, LLC,<br><br>        Defendants. | Case No. CR 17-00661(A)-DMG<br><br>**SUREGERY CENTER MANAGEMENT, LLC.'s SENTENCING MEMORANDUM** |

## SENTENCING MEMORANDUM

### I. Background

On December 16, 2021, Surgery Center Management, LLC. [SCM] was found guilty of Counts 1-31 and count 35 of the First Superseding Indictment [FSI]. Counts 1-28 were for a violation of 18 U.S.C. §§ 1341, 2. Counts 29-31 were for a violation of 18 U.S.C. §§ 1343, 2. Lastly, the guilty finding for Count 35 was for a violation of 18 U.S.C. § 1956(h). This case has been heavily litigated, and a lengthy recitation of the factual background is not necessary as it has been well summarized by the Sentencing Briefs filed by the Parties.

The USPO determined [Based on records received from the Government] that the loss attributed to SCM is $71,454,610. In determining the applicable guideline calculation, the USPO

set the offense level of 39 where the fine is limited to twice the gross gain resulting from the offense per 18 U.S.C. § 3571(d).  This analysis results in a recommended fine of $142,909,200.  Finally, the USPO determined that the restitution should be set at $71,454,610.  Thus, this Court's sentencing decision as to fine and restitution will be determined by the loss calculation attributed to SMC.  It should be noted that the Government's position as to loss has fluctuated since Trial as memorialized by Mr. Omidi in his Sentencing brief.  As argued below, it is the position of Defendant, SCM, that the Government's loss calculation fails to take into account whether services rendered were supported by medical necessity and rely on invalid legal theory of "accurate information."   In light of the foregoing, the crux of SCM's sentence rests on the loss calculation by this Court.

## II.  Loss Calculation

For the sake of brevity, SCM joins in the arguments presented by Mr. Omidi in his Sentencing position with respect to loss.  First, noting that the Government must meet the "clear and convincing evidence" burden in connection with the loss determination by this Court as the Ninth Circuit repeatedly has found that Due Process requires that the government prove disputed offense level enhancements "by clear and convincing evidence in cases where there is an extremely disproportionate impact on the sentence." United States v. Valle, 940 F.Jd 473, (9th Cir. 2019).

Second, this Court, as the 9th Circuit previously ruled, should apply the actual loss rather than "intended loss" as the Government contends.  In addition to the prior 9th Circuit decisions cited by Omidi, Ms. Busch, Omid's expert, concluded that "intended loss" figures calculated by Petron are an ill-fit for calculating damages because medical providers are typically paid significantly less than the billed amount based on contractual rates set by insurers and actual loss is the most legitimately representative form of loss.

Third, the Government's loss calculation is upon an invalid legal theory that a business is entitled to accurate information so that it can properly make informed business determinations

(Thus, any false document presented to the insurance carrier, regardless of whether such a document is material to the determination of medical necessity, is by default material to determination whether a claims for services should be paid). However, the Ninth Circuit, following a government concession of error, recently held that there is "no cognizable property interest in 'the ethereal right to accurate information'" and therefore, "the accurate-information theory is legally insufficient" basis for a fraud conviction." *United States v. Yates*, 16 F. 4th 256, 265 (9th Cir. 2021).  In *Ciminelli v. United States*, a wire fraud case currently pending before the Supreme Court, the government reinforced its concession in *Yates* with an even broader concession that the Second Circuit's "right to control" wire fraud theory (*i.e.*, a business' right to control the disposition of its assets through accurate information) was "overbroad" and "without further limitation . . . would expand property fraud beyond its definition at common law and as Congress would have understood it." 2022 WL 10224977 *12.

Forth, in light of the foregoing, the Government's loss analysis must be based on services that were paid but were not medically necessary.  Thus, the analysis presented by Mr. Omidi's brief clearly illustrates that the Government failed to conduct a statistically valid analysis of claims presented by SCM that such Claims submitted were not medically necessary.  Under Ninth Circuit law, "as always, the burden is on the government to establish what services were not medically necessary" and a district court at sentencing must ensure that a defendant is "given credit for medical services that he rendered that were justified by medical necessity" *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997).

Mr. Omidi presents a clear and thorough critique and an alternative analysis, of the Government's loss findings (Mr. Petron's reports), that is based on valid statistical analysis of whether the billed services were medically necessary and met the criteria set for by the FDA and insurance carriers. Thus, Ms. Busch's conclusions are supported by the evidence herein that (1) that "intended loss" figures calculated by Petron are not an appropriate method for calculating damages

because providers are typically paid significantly less than the billed amount based on contractual rates set by insurers;   (2) actual loss is the most legitimately representative form of loss; (3) virtually all of the patients in the FSI and Mr. Petron's random sample qualified for Lap-band surgery per FDA guidelines; and (4) the overwhelming majority of sleep study and DME based services also were medically necessary. As Dr. Sedrak indicated in his report, where alterations are made to sleep studies, such alterations are inconsistent with a scheme to defraud.

### a.     Services Rendered Were Medically Necessary

In addition to the analysis conducted by Mr. Omidi (which SCM joins), SCM retained Dr. Michael Sedrak to review the record to opine as to (a) the government's theory of loss (that sleep studies were altered in order to create medical necessity; *i.e.*, to fabricate a comorbidity for approval in patients who otherwise would not meet criteria for Lap Band surgery), and (b) to opine on the loss calculations in the report of the government's expert, Michael Petron ("Petron").  Sedrak Dec. ¶ 5

Dr. Sedrak has extensive education, training and experience in connection with bariatric surgical experience, including use of the Lap Band, and the diagnosis, care, and treatment of morbidly obese individuals, including the co-morbidities associated with obesity.  Sedrak Dec. ¶ 2. Dr. Serak is, further, familiar with principals of medical causation in general, and with specific principals of medical causation for Lap Band surgeries and related sleep studies, along with principles of insurance coverage applicable to this case.  Sedrak Dec. ¶ 3.  In order to form the basis of his opinion, Dr. Sedrak reviewed the Superseding Indictment, the Trial Transcript, Petron's reports to include the initial, first and second supplemental reports, the medical and billing records pertaining to the 250 patients in the Petron random sample list to include the sleep study reports obtained from Michael Zarrabi, Sherwin Hong, Charles Klasky, along with other relevant sleep study reports that were provided in the records.  Sedrak Dec. ¶ 6.  Moreover, Dr. Sedrak analysis of whether services rendered (within the Petron random sample) were medically necessary, is based

upon FDA and standard of care guidelines in rendering my evaluation and report (The FDA product labeling in the 2011 Summary of Safety and Effectiveness for the "Lap Band" names multiple weight related comorbid conditions to include diabetes, hypertension, back pain, depression, gallbladder disorder, gastroesophageal reflux, hypercholesterolemia, hypertriglyceridemia, metabolic syndrome, osteoarthritis, respiratory abnormalities, sleep apnea, urinary incontinence, and venous stasis.  Also, the FDA stated that patients with BMI's of 30-40 would qualify for Lap Band surgery with an obesity related comorbidity). Sedrak Dec. ¶ 7.  Dr. Sedrak's use of FDA product labeling Summary of Safety and Effectiveness is due to that facts that the Petron loss reports do not appear to have relied on any insurance plan benefit documents or summary plan descriptions were ever obtained or relied on to determine the exact coverage requirements for any patient in the reports (In normal practice with out-of-network providers, the vast majority of patients have self-insured insurance coverage.  This means that each self-insured plan has its own coverage guidelines).  Sedrak Dec. ¶8.

Dr. Sedrak found some glaring problems with the Petron report, specifically that baseline assumptions undertaken by Petron in preparation of the loss analysis.  Dr. Sedrak identified one significant limitation of the Petron report in that a licensed physician did not provide the parameters as to what constitutes medical necessity in order to determine loss.  Sedrak cites to the report where Petron acknowledges this grave limitation in a footnote in his report which states "I make no independent determination what is or is not medically necessary and/or what constitutes an Altered Sleep Study." GT_EXPERT_00000409.   Sedrak Dec. ¶9.  Essentially, Petron estimates loss without any medical necessity analysis, contrary to the prevailing case law cited herein.  Petron report erroneously attributes a loss to any patient who had an altered level of sleep apnea (contrary to Petron's trial testimony where he testified that a one (1) point alteration in the AHI constituted fraud) from that which is listed in the Michael Zarrabi technician report regardless of other recognized clinical conditions that existed and supported medical necessity for bariatric surgery

(Such as BMI of 40 or higher). Sedrak Dec. ¶9.  Dr. Sedrak notes that "*this theory [Petron's loss analysis] is also faulty as to the determination of medical necessity and fraud because it critically and inexplicably ignores the patients' clinical conditions.  For example, if a patient has a BMI of 40 or higher, qualification for the Lap Band procedure is met without any necessity of an associated comorbidity. In my extensive experience with the insurance approval of bariatric patients for surgery, virtually all insurance companies accept a patient with a BMI of 40 or higher alone as meeting the qualification for Lap Band surgery, without the need for an associated comorbidity.  Accordingly, an altered sleep study in the population of patients with a BMI of 40 or higher cannot result in a loss because the alteration is immaterial to medical necessity and for insurance qualification*."  Thus, Dr. Sedrak opines that the Petron report's assessment of loss is unreliable and should not be relied on for loss determination because it is untethered to any accepted measure of medical necessity. Id.

Dr. Sedrak further identifies a troubling pattern where sleep studies are inexplicably altered, where such alterations are wholly unnecessary for approval of claims for Lap Band surgeries.  Dr. Sedrak cites to the 250 patients in the Petron report, where 150 patients *already* had a BMI of 40 or higher (a BMI of 40 or higher *alone* for virtually all insurance companies constitutes automatic qualification for Lap Band Surgery – a fact that was undisputed during Trial).  Moreover, 111 of the 150 patients (74%) in the Patron sample who had a BMI of 40 or higher *had an altered sleep study*; *i.e.*, either the AHI or respiratory data in the sleep reports were altered, or both.  Sedrak Dec. ¶10. It is plainly illogical that a criminal enterprise would engage in modifications of sleep studies when patients already exceed the medical necessity requirements.  Moreover, Dr. Sedrak's review of the relevant medical records shows the vast majority of the patients in the Government's 250 patient sample had significant obesity related comorbidities, and many times multiple comorbidities, which further renders the alterations of sleep studies in these patients as irrational. Sedrak Dec. ¶10.

Dr. Sedrak, further, points to a failure of the Petron report due its reliance on the Michael Zarrabi draft technician reports. Dr. Sedrak explains that sleep study data are recorded electronically by specialized equipment where a technician will transfer the data from the equipment to a medium to be *analyzed by a physician*. The physician will, under the normal course of his practice, make any necessary corrections to the interpretation of the data from the sleep technician. Dr. Sedrak describes that sleep study results must be interpreted by a licensed physician who had familiarity in the area. He further indicates that the Michael Zarrabi draft technician reports (a) are not final reports, (b) and cannot be relied upon as an actual medical diagnosis or conclusion because they were never interpreted by a licensed physician. Moreover, the trial transcript indicates that the government never obtained the Zarrabi reports, which apparently were maintained on the FTP site of which the government was aware for many years. Thus, the failure to obtain the Zarrabi reports renders the Petron report unreliable because *only* a licensed doctor can provide a *diagnosis*, not a technician.

In support of his assertion that the Zarabi reports are unreliable, Dr. Sedrak review indicates that the Michael Zarrabi draft technician reports were often flawed because they missed significant apneic episodes. Further, his review of the portion of the trial testimony regarding the accuracy of the Michael Zarrabi draft technician reports shows that due to underlying incomplete or invalid data, the Government's physician witness, Dr. Neil Kline, was unable to score approximately 80-90% of the studies Michael Zarrabi somehow scored. Therefore, if there is incomplete or invalid underlying data, the actual number of apnea episodes will be missed, resulting in erroneous reporting of lower sleep apnea levels than the patient's true sleep apnea level. The aforementioned led Dr. Sedrak to conclude that 80-90% of Michael Zarrabi draft technician reports cannot be relied on for a reasonable determination of loss rendering the entire Petron report unreliable as a measure of loss. Sedrak Dec. ¶12.

Dr. Sedrak also reviewed a <u>sample of the patients from the Petron loss report</u> *where Michael Zarrabi draft technician report shows <u>no sleep apnea</u>,* but the clinical picture strongly suggests the existence of sleep apnea. Dr. Sedrak's analysis of the 13 patient records supports the findings that to a reasonable degree of medical certainty, the Michael Zarrabi technician draft sleep study reports are unreliable and should not have been used as a diagnosis, or as a basis for any analysis or conclusion, to include loss determination. Sedrak Dec. ¶12. One example of Dr. Sedrak's review is as follows:

*Patient L.S. was a 17 year old female with a BMI of 41, and presented with a pre-existing diagnosis of sleep apnea confirmed by a referral letter from her primary physician. The patient also reported sleep apnea at initial exam. The Michael Zarrabi draft technician report stated the AHI was 3.1, which is inconsistent with her established diagnosis of sleep apnea and the clinical findings*. Sedrak Dec. ¶12. The last patient file reviewed, C.U. requested a Lap Band *removal* procedure which does not require qualification for the Lap Band procedure, yet she is included in the Petron loss report. It is, in fact, inexplicable why would SCM and OMIDI would go to any great length to modify sleep study results for such a patient who clearly meets medical necessity requirements for Lab Band surgery and further studies regarding the use of a CPAP device.

Dr. Sedrak's review included review of records that illustrate that Dr. Atul Madan, the bariatric surgery program coordinator at the facilities, followed American Society for Metabolic and Bariatric Surgery and literature recommendations to have all bariatric candidates evaluated by sleep study for sleep apnea, due to the high incidence of obstructive sleep apnea in the morbidly obese population and the consequences of undiagnosed and/or untreated sleep apnea in bariatric or any higher risk patients undergoing general surgical procedures. Therefore, all initial sleep studies were medically indicated. Sedrak Dec. ¶12. Moreover, Dr. Sedrak opines that <u>all</u> patients with any degree of sleep apnea (mild, moderate or severe) benefit from CPAP treatment. Therefore, the CPAP titration studies for these patients and prescription of the CPAP durable medical devices

were medically necessary. He notes, further, that with respect to the few patients in the Petron sample where the Michael Zarrabi draft technician report showed no sleep apnea, the majority of these patients, he opines is that technician's reports were defective because they are inconsistent with the clinical picture of the patients, which was not addressed in the Petron report. To a reasonable degree of medical certainty, it cannot be said that these patients did not have sleep apnea, thus rendering the Government's loss calculation unreliable.

In light of the foregoing independent analysis of Dr. Michael Sedrak coupled with Ms. Busch's conclusions medical necessity was supported by the evidence herein and that the overwhelming majority of sleep study and DME based services also were medically necessary.

### III. Restitution

Defendant SCM joins OMIDI's argument regarding restitution and the request for a hearing as set forth in the OMIDI sentencing brief.

### IV. Conclusion

Based on the foregoing, SCM managements, respectfully, requests that this Court set the loss, and respective fine, in the sum commensurate with the findings of Dr. Sedrak and Ms. Busch.

Respectfully Submitted,

Dated: February 15, 2023

/s/ Elon Berk, Esq.
Attorney for Defendant, Surgery Center Management, LLC.